# Commonwealth *v.* Deutsch, Appellant.

*Criminal procedure—Juries—Challenge of array.*

A challenge of the array of jurors, because the record fails to affirmatively show that the jurors purporting to have been drawn and summoned, were drawn from the body of the county wherein the trials were held, is properly overruled, where the record shows that the venire was issued in pursuance of the precept to the sheriff and jury commissioners, and that the sheriff returned a list of

names with the residence of each individual attached. The court has the right to presume that the jury wheel was filled in the manner prescribed by law and, under such presumption, no names other than those qualified according to law to serve as jurors within the particular county, could have been drawn.

*Criminal procedure—Prosecuting officers—Counsel for the Commonwealth.*

An objection on the part of the defendant to the admission of the district attorney of another county to assist in the prosecution is without merit. Where, in an indictment for conspiracy, the venue is changed in accordance with the order of the Supreme Court, the district attorney of the county to which the case was sent became the responsible head of the prosecution; he had the right to associate with him the district attorney of the county in which the offense was committed, or any of his assistants, and the defendant had no legal concern with the personality of those selected by the Commonwealth, to conduct the prosecution.

*Criminal procedure—Challenge for cause—Opinion of the court.*

The challenge of a juror for cause is addressed to the trial judge and much weight must be given to his judgment in passing upon it. He has all the advantages which a trained intellect possesses in drawing conclusions from the impressions gathered by the senses in the open examination of an individual juror under such circumstances. There necessarily resides in him a wide discretion and his conclusions are not to be reversed unless there appears to be some substantial reason to convince the appellate court that the action taken was erroneous.

*Criminal procedure — Indictment for conspiracy — Number of challenges.*

The provisions of the 40th Section of the Act of March 31, 1860, providing that "In all cases in which two or more persons are indicted for any offense......the accused shall have the right to the same number of peremptory challenges to which either would be entitled if separately tried and no more," fixes the number of peremptory challenges allowable in the trial of an indictment of two or more persons for conspiracy. The right of the accused to peremptory challenges is legislative in its origin and the power necessarily resides in the general assembly which may from time to time change the method by which a jury is to be selected in accordance with the dictates of wisdom and experience, so long as the statutes do not attempt to set up a new kind of trial body other than that secured by the bill of rights.

*Criminal law—Indictment for conspiracy—Coconspirators—Evidence of coconspirators—Admissibility.*

On an indictment for conspiracy, the acts and declarations of one individual, done and uttered in pursuance of a common design, become the acts and declarations of all concerned and are, therefore, admissible against each of the defendants. While the declarations of a third person, made in the absence of the defendant and without his knowledge, are inadmissible against him as a general rule, if the conspiracy is afterwards established by evidence, and it is shown that the person whose declarations have been admitted in evidence is one of the coconspirators, then it is not error to have received the declaration of such co-conspirator in advance of the proof of the conspiracy itself.

*Criminal law—Conspiracy — Influencing jury — Newspaper articles.*

It is not error for a trial judge to refuse to withdraw a juror and continue the case, because of certain publications in newspapers, reciting in their own language, the substance of the testimony produced in the court on the day previous to such publications, and making certain comments concerning the witnesses by whom the testimony was delivered. Where the verdict of the jury was amply warranted by the evidence, there is no reason for the court to assume that the jurors were improperly influenced by reading the newspaper accounts of the trial.

*Criminal law—Attempt to influence juror—Examination of juror during trial.*

Where, during the trial of a criminal case an alleged attempt to influence one of the jurors is brought to the attention of the court, the trial judge may interrupt the course of the trial and examine the jury. Having made such investigation and being satisfied that no harm had been done he may proceed with the case.

Argued April 28, 1919. Appeals, Nos. 59 to 72, Oct. T., 1918, by Isaac Deutsch, David Bennett, John Wirtschafter, Michael J. Murphy, Emanuel Uram, Lewis Feldman and Clarence H. Hayden, from judgment of Q. S. Chester Co., special session, July, 1918, on change of venue from Q. S. Philadelphia Co., December Sess., 1917, Nos. 471-472, on verdict of guilty in case of Commonwealth v. Isaac Deutsch, David Bennett, John Wirtschafter, Michael J. Murphy, Emanuel Uram, Lewis Feldman and Clarence H. Hayden. Before ORLADY,

P. J., PORTER, HENDERSON, HEAD, TREXLER, WILLIAMS and KELLER, JJ.    Affirmed.

Indictment for conspiracy to prevent a free and fair election.    Before HAUSE, J.

The indictment charged the defendants with conspiracy to prevent a free and fair election and to intimidate, overawe, assault, etc., electors at a primary held in the City of Philadelphia on the 19th day of September, 1917, and with conspiracy to violate the provisions of an Act of Assembly of February 15, 1906, P. L. 19, known as the Shern Act.

Upon petitions filed in the Supreme Court asking for a change of venue, a rule was granted to show cause why a writ of certiorari should not be granted and a certiorari afterwards was issued taking the records of the cases to the Supreme Court.    The Supreme Court made an order changing the venue and certifying the record to the Court of Oyer and Terminer and Quarter Sessions of the Peace for the County of Chester with instructions to proceed as if the indictments had been originally found in that county.

The cases were tried in the Court of Oyer and Terminer and Quarter Sessions of the Peace for the County of Chester.

Verdict of guilty upon which judgment of sentence was passed.    Defendants appealed.

*Errors assigned,* among others, were the refusal of defendants' challenge to the array, refusal to allow certain challenges for cause, refusal of the trial judge to withdraw a juror and continue the case because of certain publications in Philadelphia newspapers reciting the proceedings of the trial, refusal of defendants' motion to withdraw a juror because of certain attempt to influence one of the jurors, and various rulings on evidence and the charge of the court.

*William A. Gray,* for appellants.—The court erred in overruling the motion of the defendants to quash the venire of the jurors, which did not set forth that the jurors were drawn from Chester County : White v. Commonwealth, 6 Binney 179; Eaton v. Commonwealth, 6 Binney 447; Act of March 31, 1860, P. L. 427, Section 53.

The court erred in overruling the defendants' challenges for cause to certain jurors who had clearly formed an opinion : Staup v. Com., 74 Pa. 458; Allison v. Com., 99 Pa. 17; Com. v. House, 3 Pa. Superior Ct. 304; Com. v. Curcio, 218 Pa. 327; Com. v. Sushinskie, 242 Pa. 406.

The court erred in admitting the testimony of coconspirators : Thomas v. Madden, 50 Pa. 261; Heine v. Com., 91 Pa. 145; Wagner v. Aulenbach, 170 Pa. 495.

The accounts of the trial, published in various newspapers, were highly prejudicial to the defendant and were ample reasons for granting a new trial : Com. v. McCartney, 14 D. R. 609; United States v. Ogden, 10 D. R. 1; Com. v. Johnson, 5 Pa. C. C. 236; Maltox v. United States, 146 U. S. 140; Fisher v. Fisher, 20 D. R. 56; Meyer v. Cadwalader, 1 D. R. 274.

The attempt to bribe a juror must have influenced the jury against the defendants and deprived them of free and unbiased hearing, and a new trial should have been granted : Redmond v. Royal Ins. Co., 7 Phila. 167; Keegan v. McCandless, 7 Phila. 248; Elkins v. Gaff, 2 W. N. C. 586; Chahoon v. Hackly, 5 Kulp 397; Com. v. Martin, 16 Pa. C. C. 140; Johnson v. Traction Co., 8 Del. Co. 346; Boreland v. St. Clair, 4 Pa. C. C. 541; Harvester v. Hodge, 6 D. R. 378; Mi:. v. North American Co., 209 Pa. 636; Com. v. Tilly, 25 Pa. Superior Ct. 35.

*Joseph H. Taulane,* Assistant District Attorney Philadelphia County, and with him *Samuel P. Rotan,* District Attorney Philadelphia County, *Truman D. Wade,* District Attorney of Chester County, *James Gay Gor-*

don, Jr., Assistant District Attorney Philadelphia County, and Robert S. Gawthrop, for appellee.—The return to the venire was issued in the usual form and the defendants waived any errors by pleading: Holmes v. Com., 25 Pa. 221, 224; Com. v. Seybert, 4 C. C. R. 152, 154; Com. v. Beucher, 10 C. C. R. 3.

The overruling of a challenge for cause, even if erroneous, before the defendants had exhausted their peremptory challenges, did them no injury: Com. v. Pease, 220 Pa. 371; Com. v. Delero, 218 Pa. 487; Com. v. Minney, 216 Pa. 149; Com. v. Henderson, 242 Pa. 372.

Whether a juror should be challenged for cause is a matter primarily within the discretion of the trial judge: Commonwealth v. Sushinskie, 242 Pa. 406, 413; Com. v. Crossmire, 156 Pa. 304; Com. v. Merrick, 65 Pa. Superior Ct. 482; Com. v. Eagan, 190 Pa. 10.

The order of proof in a conspiracy trial is for the sole discretion of the trial judge, and it was within the power of the court to allow the several acts and declarations of the various conspirators to be shown for the purpose of building up a case against the defendants: Com. v. Bumm, 19 Phila. 530, 531; Hanbest v. Herman, 2 Walker (Pa.) 471; Com. v. Moyer, 52 Pa. Superior Ct. 554; Gantt v. Cox, 199 Pa. 208, 217; Com. v. Duffy, 20 D. R. 507; Com. v. Dietrick, 221 Pa. 7.

It cannot be assumed that the accounts of the trial published in the newspapers influenced the verdict against the defendants: Alexander v. Com., 105 Pa. 1; Com. v. Filer, 249 Pa. 179; Com. v. Valverdi, 32 Pa. Superior Ct. 241.

It was within the judgment of the court to investigate the attempt to influence a juror and, if satisfied that no injustice would be done, to proceed with the case: Com. v. Tilly, 33 Pa. Superior Ct. 35.

OPINION BY HEAD, J., July 17, 1919:

These appeals present for our consideration about six thousand printed pages portraying in detail the course of

the trial with all of its incidents and the testimony taken, all brought upon the record by fifty-five assignments of error. We think it but a just recognition of the skill and industry manifested by counsel in the preparation of their paper-books and the presentation of their arguments at bar to say they have spared no effort to lighten the labors of the court made necessary in the review of a record so unusual in size. Each assignment has received the consideration demanded by the relative importance of the questions raised by it. If some of them be not herein specially adverted to, it is because of our conclusion they are sufficiently answered by the judgment we shall render.

The first and second assignments complain of the refusal by the court to quash the venire and return and the overruling of a "challenge of the array," because the record fails to show affirmatively "that the jurors, purporting to have been drawn and summoned, were drawn from the body of the County of Chester." We are urged to hold that the fifty-third section of the Act of March 31, 1860, fully disposes of these assignments. There is much force in the supporting argument, even though the defendants were arraigned in Philadelphia and plea was there entered long before the venue was changed to Chester County. If, after the panel had been summoned in that county, there appeared cause for a challenge of the array leave to withdraw the plea could have been asked and obtained so that the right of challenge could be properly exercised.

But further consideration of this question becomes unnecessary because, apart from it, an inspection of the record, in our judgment, shows it to be without flaw or defect in the respect complained of. The precept addressed to the sheriff and commissioners of Chester County was this: "We command you and every of you that in your proper persons you draw from the wheel containing the names of the persons selected according to law to be jurors in said county the names of fifty persons," etc.; "and that you (the said sheriff) do summon

298, (1919).]          Opinion of the Court.

the persons whose names shall be so drawn to come before our said courts......and that you have then and there this writ and the names and surnames of the persons so summoned." To the venire issued in pursuance of the precept the sheriff returns a list of names with residence of each individual attached, to which he adds this certificate: "Drawn and selected according to the act of assembly, summoned and made known to all the above-named jurors, except," etc. Our statute directs in detail the manner in which the jury wheel shall be filled and we have the right to presume it was filled in the manner prescribed by the law. If so, it could contain no names other than those qualified according to law to serve as jurors in the County of Chester. The record does show then that the names of the jurors empanelled for the particular session of the court at which this case was tried were drawn from the body of the County of Chester.

The third assignment is without merit. When the venue was changed to Chester County, under the law and the order of the Supreme Court the district attorney of that county became the responsible head of the prosecution. His were the power and the duty to properly present the Commonwealth's side of the case. On his motion the court specially admitted to the bar, the district attorney of Philadelphia County, and one or two of his assistants. How can the defendants be heard to say they were aggrieved by that act of the court? They had the right to be tried according to law but they had no legal concern with the personality of those selected by the Commonwealth to conduct the prosecution. The rules of law and evidence did not change with the personnel of those selected by the prosecuting officer to assist him. It would be a startling proposition to affirm the defendants had the right not only to select their own counsel, but also to have a voice in the choice of those who were to act for the Commonwealth.

The fourth, fifth and sixth assignments go to the action of the learned trial judge refusing to allow three chal-

lenges for cause to three separate jurors. There are not many questions, relating to the procedure in trials of cases in our criminal courts, that have been more frequently the subject of consideration by the appellate courts, than those growing out of challenges for cause. Necessarily there is considerable difference in the form of expression adopted by the opinion writers in such cases. To attempt to review all of the cases and harmonize all of the language that may be culled from the different opinions would be a task beyond our conception of what is required of us here and now. We shall quote what we regard as accurate statements of the purpose and object to be attained in the examination of jurors upon their voir dire. In Commonwealth v. Sushinskie, 242 Pa. 406, the present Chief Justice, speaking for the court, said: "The challenge of a juror for cause is addressed to the trial judge, and much weight must be given to his judgment in passing upon it. In exercising his discretion as to the fitness of a juror to serve, he has the juror before him, and much latitude must be left to him; and the weight to be given to the answers of a juror when examined on his voir dire is not to be determined exclusively by his words as we read them in the printed record. They are first to be weighed by the trial judge who sees and hears the juror, and, in the exercise of a wide discretion, may conclude that he is not competent to enter the jury box for the purpose of rendering an impartial verdict, notwithstanding his words to the contrary;......
and nothing short of palpable error will justify a reversal of a trial judge in passing upon a challenge for cause." If indeed our law is to respond, even in a faint way, to the eulogy pronounced by him who declared it to be "the perfection of reason," how necessarily it must follow that the language we have quoted accurately describes the real situation. The trial judge is ordinarily a resident of the district embraced within the jurisdiction of the court in which he presides. It accords with our everyday experience to conclude that his acquaintanceship with the peo-

ple of that district is extensive. He knows its communities, their environments, and much of the general standards of education and morality that prevailed among those who dwell in them. He has all of the advantages which a trained intellect possesses in drawing conclusions from the impressions gathered by his senses in the open examination of an individual juror under such circumstances. Manifestly an honest conclusion reached by him ought not to be overthrown without plain and serious reasons for such action.

The objective point to be aimed at in the examination of jurors upon their voir dire is well stated by Mr. Justice McCollum in the following language taken from the opinion in Commonwealth v. Crossmire, 156 Pa. 304; "It appears from this examination that the jurors had impressions or opinions on the subject, based on what they had heard and read about the murder, but the opinions thus formed were not deliberate and fixed opinions, or such as would prevent a just decision of the case upon the evidence. Opinions formed as above stated are not disqualifying if they do not deny to legal evidence its legitimate effect. Intelligent men receive impressions as to the nature and character of any transaction from what they hear and read of it, and it is not unusual to speak of these as opinions." So it was said in Allison v. Commonwealth, 99 Pa. 17: "Impressions formed upon the mind necessarily remain until something occurs to remove them. This is a law of our nature, and cannot be changed by human agency. That evidence would be required to change these impressions has but little weight. Such must always be the fact even in case of slight impressions or loose opinions," etc.

It is clear then that three considerations must be kept prominently in view in disposing of the questions raised by the assignments with which we are now dealing. First, there necessarily resides in the trial judge a wide discretion and his conclusions are not to be reversed unless there appears some substantial reason to convince the

appellate court the action taken was erroneous; second, the conclusion arrived at must be the result of a study of the whole of the testimony elicited on the examination, and third, the trial court, as well as the reviewing tribunal, must be satisfied there was no state of mind of the proposed juror that would deny to legal evidence its legitimate effect. We cannot but know that the language used by the average man in an attempt to analyze his own state of mind is frequently inaccurate although it may be in the highest degree honest. The trained mind would not be likely to use the word impression as a synonym for the word opinion. Such differences are not always apparent to the witness who naturally adopts the form of expression used by interrogating counsel. Hence it so often happens that jurors in their answers appear to contradict themselves whereas in fact they simply fail to appreciate the difference in meaning between one question and another. We have read and reread all of the testimony of each one of the jurors challenged and we are obliged to conclude that we can perceive no abuse of discretion in the disposition made by the trial judge of the challenges for cause which have become the subject of these assignments.

The seventh and eighth assignments of error are based upon the refusal of the learned trial judge to recognize the alleged right to four peremptory challenges by each one of the defendants who were being jointly tried. If the fortieth section of the Act of March 31, 1860, be a valid piece of legislation, it fully justifies the view taken by the trial judge. It in terms declares that "In all cases in which two or more persons are indicted for any offense ......the accused shall have the right to the same number of peremptory challenges to which either would be entitled if separately tried and no more." Our Bill of Rights declares, "Trial by jury shall be as heretofore and the right thereof remain inviolate." It will be observed our fundamental law provides no method by which the twelve jurors necessary are to be selected and empan-

elled. The people therefore, by whom the Constitution was adopted, did not, by its adoption, withdraw from legislative determination, through the ordinary channels, the mode or manner in which the jury should be organized. The Constitution itself does not secure to any defendant the right to such challenge at all. The right as it now exists is legislative in its origin and the power necessarily resides in the general assembly, from time to time to change the method by which a jury is to be selected in accordance with the dictates of wisdom and experience, so long as the statutes do not attempt to set up a new kind of trial body which should not be "as heretofore." We may quote with propriety the language of Mr. Justice THOMPSON in Warren v. Commonwealth, 37 Pa. 45, as follows: "But, is the act of challenging which always precedes the trial, properly, and, within the meaning of the Constitution, part of it? Is not the simple organization, a form through which it is necessary to pass to arrive at a trial? That it is so is strongly asserted by BLACK, C. J., in McFadden v. Commonwealth, 11 Harris 12, and so it has been held by the Supreme Court of South Carolina, Cregan v. Bunton, 2 Strob. 487. This is a rational view of the subject, with the reservation, however, that the law of organization be not such as to defeat the right." And so we may say generally, without here even citing the cases, that such is the view adopted by the courts of most of our sister states. These assignments must be dismissed.

The ninth and sixteenth assignments assail the correctness of the rulings of the trial judge admitting in evidence certain declarations of alleged coconspirators before the fact of the conspiracy was established or sufficient evidence from which such fact might be inferred had been introduced. Of course our courts hold fast to the general principle that the declarations of a third person, made in the absence of a defendant, and without his knowledge, are inadmissible against him. But it is just as certain that from the nature of the offense we call con-

spiracy, the acts and declarations of one individual, done and uttered in pursuance and execution of a common design, become the acts and declarations of all concerned and are therefore admissible against each of the defendants. Now it is trite to say that rarely, if ever, may conspiracy be proven by direct evidence of the unlawful agreement. That must be established, if at all, as the rational and necessary inference to be drawn from a number of circumstances separately proven which, when established, point to a common design as the source and origin whence they sprung. In the case at bar, we do not understand that any one seriously contends that when the case of the Commonwealth was concluded, the court could have withdrawn it from the consideration of the jury, because there was no sufficient evidence to support a verdict of guilty. The jury has passed upon the credibility of the witnesses and determined that a conspiracy did in fact exist. There must then have come a time in the trial of the case when no successful objection could have been made to the introduction of the evidence complained of. In the last analysis therefore the objection we are now considering is but one to the order in which the trial judge permitted the testimony of the Commonwealth to be introduced. There was no way in which the defendants could escape the consideration by the jury of the declarations here complained of. The able counsel for the appellant himself, after stating the general rule of the law, thus recognizes the precise situation we have before us. "But it will also be admitted that the matter of the order of proof is, to a certain extent, within the discretion of the trial judge, and if the conspiracy is afterwards established by evidence, and it is shown that the person whose declarations have been admitted in evidence is one of the coconspirators, then it is not error to have received the declaration of a coconspirator in advance of the proof of the conspiracy itself." If then the judgment were to be reversed on the strength of these assignments, a new trial could but change the order in which the testimony

of the Commonwealth would be offered, and in the end the defendants would be confronted with precisely the same situation they were here compelled to face when the case was submitted to the jury. The assignments are not sustained.

The fourteenth and fifteenth assignments complain of the admission of evidence of the declarations of a coconspirator made, as it is alleged, after the conspiracy had been fully executed. We are not at all prepared to say that the ways and means of paying those active in the performance of the unlawful and criminal things disclosed by the evidence of the Commonwealth, was a matter outside of the conspiracy itself. Indeed it appears to us to have been one of the important elements in it which would not likely be overlooked by those with whom it originated. We are not convinced the court below committed any error in admitting the evidence complained of.

With relation to the tenth assignment, it is only necessary to say the court was well within fully recognized limitations in permitting the district attorney to attempt to elicit the truth from a witness, either ignorant or unwilling, by what may be generally described as cross-examining his own witness.

The eighteenth, twenty-first and twenty-fourth assignments rest upon the refusal of the learned trial judge to withdraw a juror and continue the case because of certain publications in the Philadelphia newspapers reciting in their own language, the substance of the testimony produced in court on the day previous to the publications, and making certain comments concerning the witnesses by whom the testimony was delivered. These comments were contained chiefly in headlines or paragraphs, constructed with that lack of economy in the use of adjectives that seems to be characteristic of the newspapers of to-day. The newspapers themselves are not on trial for any alleged abuse of their rights or breach of their obligations towards any citizen. There would be neither

propriety nor advantage in attempting to deliver an academic lecture on the question how those rights should be exercised or those obligations obeyed. It ought to be reasonably evident that, when the people have created certain tribunals invested with the duty and armed with the power of administering the public law of the land, perplexing situations, like the one now before us, could be easily avoided were it generally conceded that such tribunals could best discharge their onerous responsibilities, by being permitted to reach their conclusions unembarrassed by either aid or interference from outside sources. The courts, however, must be concerned to see, in so far as it lies in their power, the jurors empanelled and sworn in the trial of a case are protected from any injection into their minds, from other sources than the sworn testimony, of matters or views reasonably likely to bring about a verdict, based on other considerations than those which alone have been regarded by our lawmakers as the proper foundation upon which such verdicts must rest. It is clear enough in the first place that the newspapers, even if read by the jurors, presented no material facts to their minds which had not been made known first to them by the public proceedings in court.

It will illustrate our view to consider for a moment the published statement concerning the witness Gibboney and the testimony delivered by him on the day before the publication. One Clark had been arrested as an active participant in the alleged conspiracy, and at the time of the trial of these defendants, was under bail awaiting his own trial. He had been called as a witness by the Commonwealth and given his version of the occurrences of election day and the day preceding. The theory of the defense was that no conspiracy to "rough house" the Fifth ward had been entered into by the friends of Deutsch or by any persons for his benefit. On the contrary, that such a conspiracy had been "hatched" by one Maloney and other powerful friends of Carey. The plan was said to be to bring a number of men from New York,

distribute them through the ward, have them commit a series of lawless acts, that on their face would appear to have been instigated by the friends of Deutsch, to the end that Carey would finally get the benefit of the outburst of popular indignation that would certainly follow.

To support that theory the witness Gibboney was called by the defense. He stated he had been for many years, and was then, connected with the Law and Order Society of Philadelphia; that on the day before the primary election Clark had called at his office and voluntarily related, in full detail, the plan that was to be followed. "He told practically all that occurred on the following day except the murder; he did not forecast that." "Sam (meaning Maloney) has been working a big plant on the Deutsch and Vare bunch which will stand a good chance to put them all out of business. We have a bunch of strong arm men planted in the ward and they will rough house the ward so that they will get the Vare crowd in so bad that even if Deutsch wins to-morrow he will lose on a recount or in November......The North American and the Penrose people, some of them, are all behind this scheme of ours. Smith, the mayor, is to be ruined," etc. Immediately on the conclusion of this conversation the witness reduced its substance to writing. Now all of this occurred, the witness declared, many hours before the serious results of the plan began to flow from its execution. All of the authorities of city or county were accessible to the witness. Measures could readily have been taken to thwart the conspirators but the witness spoke to no one in authority, although he states, "I believe it was a frame-up. I believe it now." The jury heard his explanation for his silence. They had already learned from the evidence that it was Carey's friends on the police force who had been removed to other districts. They had heard of the sudden activity of the police with relation to citizens in the ward who had not theretofore been molested. They had listened to the recital of the issue by Magistrate Persch of numbers of

blank warrants and how they were used. They knew all
the acts of the "strong arm men" resulting in the violent
raiding of the Finletter Club (a Carey organization), in
the murder of Eppley, in the almost fatal assault on
Carey himself, and the blackjacking of Assistant District
Attorney Maurer, walking with him in broad daylight on
a public street of the city. All of these things must have
been the subject of serious consideration by the jury be-
fore the publication of the following day could have be-
come known to them. We quote what we suppose to be
its most objectionable portions.

Headlines:

"Gibboney swears he knew in advance of Fifth Crimes.
Admits he did nothing to stop them; kept secret twenty
days, springs Confession to aid Frame-up Plea."

First paragraph of the article:

"Fifth ward thugs, whose assault on the primary elec-
tion last fall led to the murder of Policeman George Ep-
pley by hired gunmen in the interest of Vare-Smith rule,
had as their defender yesterday in court the malodorous
D. Clarence Gibboney. This degenerate reformer, now an
agent of the booze interests, went on the stand and swore
that Jimmy Clark, the man with the eye glasses in the
gunmen's story, told him the day before the murder of
Eppley that gunmen were to be imported to rough house
the Fifth ward and that the North American and Sena-
tor Penrose was in the conspiracy." In so far as this
is descriptive of the evidence that was delivered at the
trial, we do not see that it could be the subject of serious
complaint. We dismiss also as unimportant the state-
ment of fact, if it be a fact, that the witness was an agent
or representative of the "booze" interests. The use of
the word booze, instead of liquor, has become so preva-
lent in the language, both of platform and pulpit, that
it is not likely to attract much notice from any one.
That the expressions "malodorous" and "degenerate re-
former" were not intended to be complimentary we may
fairly assume, but it is not so easy to affirm what impres-

sion, if any, they would make on the minds of the jurors who may have read the article. Malodorous in what respect? There is no reason to suppose the jurors were familiar with any career of the witness in the City of Philadelphia. If he had undertaken to bring about some reforms in the city and had found himself unable to succeed in obtaining practical results and therefore abandoned them, was he a degenerate reformer on that account? The expressions used are vague, and however pregnant with meaning they might be to those familiar with the career of the witness, can it be affirmed with any reasonable degree of probability that the jury gave them any serious attention whatever? They had much to think about from the very nature of the testimony of the witness, especially in the light of what had been done according to the evidence produced by the Commonwealth. If in fact they were not convinced of the truth of the story related by the witness, is it at all necessary to go outside of the evidence to find a reason for their conclusion? Had these expressions been used by counsel in summing up for the Commonwealth, it would be difficult to say there was not some warrant in the evidence for their use. Could the jurors be blamed if they were startled first of all by the fact that the self-confessed conspirator, Clark, would select an officer of the Law and Order Society as one to whom he would relate, in advance, the history of his own intended crime? Would they wonder that such officer, being warned in advance of what was likely to happen, did not arouse the authorities and set in motion the machinery of the law to prevent such serious crimes? The jury, by their verdict, stamped as truthful the evidence delivered by the Commonwealth's witnesses. In that evidence there is ample warrant for the verdict they rendered. Why should the learned judge below, the court in banc, and this court be asked to surmise or conjecture that the verdict was the illegitimate child of the unsworn statement complained of, when a host of witnesses testified to facts from which

the verdict would legitimately spring? Drastic action by the courts should be founded on facts or probable inferences therefrom. We think it is asking the court to take a long step when we are urged to set aside this verdict, on the ground that the jurors may have been improperly influenced by reading the article complained of, if in fact they read it. That there is such a possibility no one of course can deny. But we are not convinced that any fair probability of it has been made to appear which would justify us in taking the action urged upon us. If we are to continue to have faith in our jury system, it must rest on the belief that when men of average intelligence and integrity have solemnly sworn to be guided in their deliberations by the evidence produced and that alone, there will be enough of firmness and stability of mind on their part to prevent them being swerved from the line of their duty by the vague unsworn statements of any one, who does not share the responsibility which has been assumed by the jurors themselves. But it may be said that the preservation of the dignity of the courts would be imperiled if trials are to be attended with such incidents. We think not. The real dignity of the courts must have its roots in the ability and integrity of the judges who preside therein and the fearlessness and impartiality with which they exercise their powers. It is not an exotic plant which can bloom only in the artificial atmosphere of a hothouse. There is therefore, in our opinion, nothing in that consideration to warrant our interference with the judgments in question.

The conduct of a trial judge under such circumstances is prescribed by no statute nor by any rule of law that can be automatically applied to every case. The principle to be followed is clear enough. Where a trial judge is, or should be satisfied, either that harm actually has been done or that resulting harm is but the natural and probable inference from the publication complained of, it would be his duty to set aside the verdict. If he failed to perform his duty in this respect, ours would be equally

plain.   The correctness of his action or of ours, under such circumstances, must depend on the soundness of the judgment which determines the probable, reasonable effect of these publications on the minds of the jurors or those of them who may have actually read them.   After the best consideration we have been able to give to the question involved, we are satisfied the learned trial judge has not been convicted of any abuse of discretion in denying the defendants' motion.   The assignments are not sustained.

Another remarkable episode occurred by reason of which another motion to withdraw a juror and continue the case was made by counsel for defendants.   The motion was denied and this ruling is complained of in the twenty-third assignment of error.   As we have already indicated, the jury were not kept in the custody of the officers of the court during the lengthy trial, but were permitted to separate each evening and go to their respective homes.   It transpired that on one evening, almost at the conclusion of the trial, one of the jurors was approached by a person named Allen who appears to have been a stranger to the entire record.   He was a policeman in the City of Philadelphia, located in a different ward from that in which the trouble had occurred.   He had some acquaintance with the juror, Weaver, and met him in or about the barn, where the juror was engaged in doing whatever may have been necessary before retiring for the night.   He told the juror he was greatly interested in the case and desired the acquittal of the defendants; also that a very considerable sum of money had been raised, most of which would go to the juror if the desired result could be accomplished.   He then placed a paper in the hands of the latter and told him he could examine it on his return to the house.   An examination disclosed that he had handed to the juror three paper bills aggregating the sum of fifty dollars.   The juror passed a restless uncomfortable night, and, rising early the next morning, went to the nearby village, found Allen

and returned the money to him. When the court convened on the following morning the trial judge had obtained some knowledge of the matter and first examined the individual juror on the subject. This was followed by a further examination of all of the members of the jury in the presence of each other. As a result of this investigation the learned trial judge became satisfied that whatever may have been the plan of Allen, his scheme had failed. No other juror had been approached and the minds of all of them, so far as the trial judge could learn from his examination, adhered steadily to the proposition that their verdict would be based upon the evidence and it alone, and that the unfortunate occurrence already described would have no effect whatever in the performance of their duties. Being reasonably satisfied with the results of the investigation, the trial judge denied the motion and the trial proceeded to its conclusion. In deciding upon the course of action to be followed, the trial judge gave full credence to the proposition that no one of the defendants had any knowledge whatever of the action attempted by Allen. He disposed of the matter just as if each one of the defendants had been put upon his oath and had so testified. Was there any absolute duty imposed on him to dismiss the jury and stop the proceedings under the circumstances we have detailed? Although such episodes are happily rare, they have occurred. In Commonwealth v. Tilly, 33 Pa. Superior Ct. 35, a like assault upon the integrity of the jury was attempted. In considering the proper action to be taken by the trial judge under such circumstances, our Brother HENDERSON thus expressed the views of this court: "This court acted with propriety in directing an investigation of the alleged attempt to influence one of the jurors. It was due to the orderly administration of justice that inquiry be made on the subject before the case proceeded further. If such an attempt had succeeded, a miscarriage of justice might have resulted, and it would have been a useless proceeding on the part of the Common-

wealth to have continued the trial of the case. No objection was made by the defendants to the examination of the juror, and it does not appear from his testimony that that which occurred had so prejudiced him as to disqualify him. He did not know in whose behalf the solicitation was made, and necessarily had no prejudice against any particular defendant. There is no reason for concluding that the jury was influenced by the transaction disclosed by the juror. If the disclosure of such an attempt constituted sufficient ground for withdrawing a juror and continuing the cause, the administration of justice might be successfully obstructed, for similar efforts might be made from time to time as succeeding trials occurred." The duty of the trial judge to searchingly investigate such an occurrence so as to disclose all of the facts, and his power thereafter to proceed with the trial or continue the case "in the exercise of a proper discretion" is declared in Mix v. North American Co., 209 Pa. 636.

Manifestly the facts disclosed in these cases were closely similar to, if not identical with those we now have before us. It is clear enough the attempt to bribe did not succeed. What the state of mind of the juror was at the moment cannot very well be told. The temperaments of men differ greatly and their conduct under such circumstances might be as varied as those temperaments. A blow in the face might be the answer of one man, and many might think a most fitting one; another might think it wise to apparently make no objection, with the idea he might thus take measures to bring about the apprehension of the briber; a third might be so perplexed and dumbfounded at such an assault upon his integrity as to do nothing until mature reflection had pointed out to him the most advisable course to pursue. As we stated before, the important question for this court, as it was for the court below, is the determination whether or not the minds of the jury, or of any one of them, were so far warped or influenced by the transaction that their final

verdict could no longer be fairly said to rest upon their consideration of the evidence and of that alone.

As we have stated, the money was returned by the juror as soon as possible after his discovery of what it was. The briber was quickly apprehended and placed under heavy bail to await his trial. But it may be said the juror should at once have gone to the trial judge and made known the facts. Such a course would have been both correct and expedient. How far his hesitation to act may have been caused by a feeling of shame over the fact he had been approached or apprehension of unpleasant notoriety, or inability to decide for himself just what was best to do, we cannot know. At all events he did truly disclose the facts to the trial judge and his fellow jurors. It may be urged that thereafter the jury could do naught else than convict because any other verdict would be ascribed to the tainted effort of the briber. Possibly so, but again this approaches perilously near the realm of mere surmise and conjecture. The jurors themselves solemnly disavowed any such feeling. Each and every one of them declared his ability and determination to complete their work as if the unpleasant episode had not occurred. The learned trial judge, knowing the men and the facts, accepted their pledge. The court in banc approved the action. We are not convinced we would advance the administration of public law or hasten the reign of justice by reversing the court below. The assignment is not sustained.

Several of the assignments are directed to the charge of the court. It is complained of as a whole as inadequate, unfair, referring only to the testimony of the Commonwealth and ignoring that offered by the defendants. Particular portions of it are specifically assigned for error, to some of which we may advert presently. The learned trial judge stated to the jury he had no intention of even attempting to review the testimony in any detail. The reasons for this course were said to be the jury had listened with care and attention to the evidence as it was

produced and counsel on each side had consumed a full day in analyzing it for them and explaining to them the principal points of contention between the Commonwealth and the defendants.

The charge next took up the bills of indictment and explained to the jury, in a manner that we regard as unobjectionable, the reason for the two indictments and the difference between the conspiracy itself and the overt acts, if any, done in pursuance of it. As a further preliminary he declared that he did not propose to express any opinion of his own on any of the important points around which the controversy chiefly revolved. He said, "You are not entitled to be guided, you must not be guided by any opinion that I might express—and I do not propose to express any—nor must you be guided by any opinion you may think I have by the interpretation of any remarks that may fall from my lips. Whether or not a particular witness or a number of witnesses are entitled to be credited, whether they are entitled to be believed, are matters entirely for you and not for the court and not for counsel. So you will observe, gentlemen of the jury, that the whole burden rests upon your shoulders. You are the final arbitrators of this controversy between the Commonwealth on the one hand and these defendants on the other." The learned trial judge might have, had he chosen so to do, gone much further in the way of expressing his own opinion without invading in any way the domain where the jury itself must reign supreme.

He then adverts to the fact that a number of public officers, "All of them what have been designated as Carey men," had been removed from that particular police district and their places filled with others. It was the contention of the Commonwealth that was but part of the scheme to remove from the Fifth ward or subdue all of the friends of Carey. Now did the trial judge ignore the defendants' contention on that subject? Let his charge answer. "Now gentlemen of the jury you must have in

mind, and it came very frankly apparently from the lips
of Mr. Deutsch, that these officers were removed; that
they were removed because they were violating the terms
of this Shern Act in that they were active politically for
Mr. Deutsch's competitor in that fall primary of 1917.
If they were, they were entitled to be removed.  If they
were not, then was their removal due to this alleged con-
spiracy, etc.?  The charge then pointed out that it was
the contention of the Commonwealth that the mayor and
his administration were behind the candidacy of Mr.
Deutsch and that some evidence had been offered on that
subject.  He explained to them that it was of little im-
portance that a factional contest had arisen as to which
of two men should thereafter control the Republican
organization in that ward; and that the material ques-
tion, under the one indictment, was "whether or not the
police and the firemen and any other city officials were
to be used in the contest as the result of the conspiracy
charged by the Commonwealth."

Turning then to the other indictment, the court refers
to the conversation between Deutsch and Maloney and
their respective statements as to what transpired.  The
contention of each of the parties to that meeting is fairly
set forth.  The jury were then instructed that if Mr.
Deutsch honestly believed, when he acceded to Maloney's
request that he be permitted to bring into the ward eight-
een guards, the object was to protect the Deutsch follow-
ers from forcible assaults from the other side, that would
constitute no offense for which he could be convicted.
In relation to the contention of the defendants that the
evidence showed a conspiracy, originating with Maloney
and Clark, to bring about a line of action that, on its face,
would benefit Deutsch but would in reality injure him,
the learned trial judge expressed a view which was later
on repeated and which has become the subject of much
complaint by the able counsel for the defendants.  The
substance of it was this.  If the evidence disclosed that
a conspiracy actually existed, it was not of primary im-

portance in the trial of these defendants to determine when or how it actually originated. The important question was, after a conspiracy to do an unlawful act had been framed, did these defendants, with knowledge of it, lend themselves to its execution? If we concede they were falsely led to believe the conspiracy had originated with the friends of Deutsch, for his benefit, when in fact it originated with his enemies and was intended to work to his injury, nevertheless if these defendants chose to become parties to it and aid in its execution, they would be guilty. If there be anything wrong with that as a statement of a legal proposition, we are unable to perceive it.

So the following language of the court, the subject of the thirtieth assignment, seems to us to be unobjectionable: "In other words, a defendant, who is found to be a part and parcel of a conspiracy to commit an illegal act, cannot shift the responsibility by proving to the jury that some one else hatched the scheme and he afterwards became a party to it and that it did not work out as he supposed it was going to operate." In referring to the conduct of the police towards the witnesses, Cohen and Janovitz, the learned judge again we think frankly set forth the two conflicting views of the parties. If these men had been conducting an unlawful business, the jury were told it was not only the right but the duty of the police officers to raid their establishments and close them up. On the other hand, if their manner of conducting their business had long been known to the police of the district and had resulted in no action by the officers, and if, just before the election, the whole attitude of the police towards these persons radically changed, it was left to the jury to say whether the raids and assaults that followed were but a part of the police activities inaugurated for the purpose of preventing the people from fully and freely expressing their views at the polls.

Again, in referring but briefly to the testimony of the witness, Gibboney, which we have heretofore considered

in connection with another assignment, the learned judge again carefully pointed out to the jury that they were not to be misled from the real inquiry that arose under the evidence into a collateral inquiry as to the origin of the conspiracy. Whether it was born in the manner and for the purpose contended for by the Commonwealth; or whether it was a frame-up by Maloney and Clark to accomplish a very different purpose, was not the true objective of the trial. Maloney and Clark had been arrested and were under indictment but were not then on trial, and the learned judge then, as before, told the jury that no matter in what brain the scheme originated, if they found from the evidence that a conspiracy existed to do an unlawful thing, and that these defendants became a part of it, they were guilty under the indictment no matter who were the persons who conceived the unlawful design.

The learned trial judge gave due weight to the testimony of the defendants tending to establish their previous good reputation and explained to the jury that they must be fully satisfied of the guilt of the defendants beyond any reasonable doubt before they could find them guilty. We think it proper to quote the following from the charge on the two points we have heretofore considered at some length for the purpose of showing that the general tenor and effect of the charge was to reasonably safeguard every right of the defendants. "It has been quite unfortunate that some one, some misguided person, has seen fit to approach one of your number. I feel quite sure that his approaches were met with utter indignation on the part of the juror. I have not seen fit to discharge you from the consideration of this case by reason of that fact because if such action should have been called for, advantage can be taken of it in the future; and while I have no doubt that all of you are aware from newspaper publications of what did occur, I want to say to you that you must, as I know you will, consider this case precisely as though nothing of that sort had ever transpired and

you never had heard tell of it. You must disabuse your minds of any thought that anybody, whether on one side or the other or on both sides, undertook in the slightest degree to prejudice your minds in the consideration of the testimony in this case." Now taking the charge as a whole, we are unable to view it in the light in which it is regarded by the zealous counsel for the appellants. It seems to us that in so far as it referred to any legal principles, it was correct, while in so far as it placed before the jury the respective contentions of the parties, it was fair, impartial and adequate.

At its conclusion many exceptions were noted by the defendants' counsel who then suggested the jury should be further instructed as to three points: (a) alleged contradictions in the testimony of the witnesses for the Commonwealth; (b) that the facts sought to be established must not only be consistent with the conclusion of guilt, but inconsistent with that of innocence; and (c) the legal principle to be applied to the testimony of an accomplice. The suggestion of counsel was adopted and the instructions that followed were, in our judgment, correct and adequate.

There are a number of assignments on many different subjects which, according to our view, cannot be sustained and which do not raise questions that require any special comment. As we stated in the outstart, there is no one of them that has not received full consideration. We have explained at great length the reasons for the conclusion we have reached as to those we regard most material and involving questions of general interest, and we can see no sufficient reason for prolonging this opinion by a detailed discussion of the remaining ones.

All of the appeals taken by the different defendants were argued together on one set of paper-books. The questions raised are identical. In those appeals a formal judgment only will be entered.

The judgment is affirmed and it is ordered that the defendants appear in the court below at such time as they

may be there called and that they be by that court committed until they have complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.