## Commonwealth v. Buzzard. No. 2.

*Criminal law—New trial—Irregularities in conduct of jurors.*

1. New trials will not be granted merely because of irregularities in the conduct of jurors or misconduct of others in their presence. It must be made to appear that the alleged misconduct was prejudicial to the rights of the accused.

2. Where a review of the evidence satisfies the trial judge of the guilt of the defendant beyond any reasonable doubt, the burden is on the defendant to satisfy the court that the alleged irregularities prejudiced him.

3. If the defendant obtains knowledge during the course of trial of any irregularities or misconduct of the jury which he believes will work to his prejudice, it is his duty immediately to lay the matter before the trial judge. If he neglects to do that, he will be held to have waived the misconduct.

Motion in arrest of judgment and rule for new trial. Q. S. Northampton Co., Feb. T., 1926, No. 81.

*Robert E. James* and *J. Cullen Ganey*, District Attorney, for Commonwealth. *Smith & Paff*, for defendant.

STEWART, P. J., Jan. 10, 1927.—After a hotly contested trial which lasted for almost two weeks, the jury brought in a verdict of "guilty." A motion in arrest of judgment was made, and at the same time a motion for a new trial was made and reasons were filed in support thereof. The subject-matter of the motion in arrest of judgment and for a new trial is identical. After examination of all the reasons, we were satisfied that the motions could not

be granted for the first and second reasons, nor for the fourth and fifth reasons, all of which matters had been fully argued at the time of trial, but we felt that the third reason should receive investigation, and, therefore, granted a rule to show cause, at the same time filing an opinion for the guidance of the parties. Depositions were taken and argument was had fully upon the subjects herein discussed. At the close of the defendant's depositions, the record shows that defendant's counsel objected to any depositions being taken by the Commonwealth. This objection was not pressed on the argument, and we do not think that it is a good one. In an investigation of this character, no technical objection should prevail, and we have found that matters really important from the defendant's point of view were brought out by the Commonwealth. The third reason is that the verdict was vitiated by the misconduct of interested witnesses and parties, as well as by statements and declarations of jurors, &c. Then follow the sub-sections to which we shall hereafter refer. Those allegations are extremely serious ones, and, if proved, demand that a new trial be granted the defendant. The law on the subject is not as well defined in Pennsylvania as it is upon most other subjects, for the reason that the granting of a new trial is a matter of discretion, and few opinions of the Supreme and Superior Courts are to be found, compared with the number in other states, although we have the benefit of a number of very late decisions which we shall refer to. It would be impossible to review the decisions of the lower courts, although we have examined all that have been cited to us. The best statement of the general subject that we have found is contained in 12 Cyc., 717, as follows:

"1. In General. All of the courts, no doubt, agree that any misconduct on the part of the jurors in a criminal case which was prejudicial to the defendant, or any such misconduct on the part of the judge, officer in charge or outsiders, improperly influencing the jurors, not caused nor waived by defendant, is ground for setting aside a conviction and granting a new trial. On the other hand, as a general rule, a new trial will not be granted where it clearly appears that defendant has not been injured or prejudiced by the misconduct.

"2. As a rule, if the party asking for a new trial participated in the misconduct, or, knowing of it, failed to call the attention of the court promptly to it and move for the dismissal of the jury, he cannot urge it as ground for a new trial.

"3. Beyond this, however, the cases are conflicting. Some hold that if such misconduct might have been prejudicial to defendant, prejudice will be presumed, particularly in capital cases, and that a new trial must be granted, unless this presumption is rebutted by affirmatively showing that there was in fact no prejudice. A few cases hold that, in capital cases at least, prejudice will be conclusively presumed and a new trial granted if there may have been prejudice. Others hold generally that prejudice will not be presumed, at least unless a probability of prejudice appears, and that a new trial will not be granted unless defendant affirmatively shows that he has been prejudiced.

"4. It may be laid down as a general rule that if the jurors in a criminal case are permitted to converse or communicate with outsiders, or if they so converse or communicate without permission, or if they are permitted by the judge or officer in charge to be or remain where they may hear remarks or conversations of outsiders, or to be otherwise subjected to improper influence, and defendant is thereby prejudiced, a new trial must be granted; but a new trial will not be granted if defendant has not been prejudiced by the irregularity. Some of the cases hold that defendant must show that he was prejudiced,

while others hold that prejudice will be presumed, unless the contrary appears or is shown by the prosecution. The rules above stated apply to conversations between the jurors and the prosecuting attorney, or judge, or witnesses. It has been said that the test to determine whether a conversation by a juror with outsiders is ground for a new trial is whether the remarks indicate that he is an unfit person to discharge the duties of a juror." A quotation taken from the opinion of Chief Justice Allen in Nichols v. Nichols, 136 Mass. 256, on page 260, is often quoted as containing the rule to follow. It is as follows: "In the various emergencies which are liable to occur in the course of a protracted trial, irregularities must occur sometimes. While the court will always seek to guard against them, and especially to keep the jury as far as possible from all influences which can cast a suspicion upon the integrity of their verdict, it nevertheless ought not to be swift to grant a new trial on account of irregularities not attended with any intentional wrong, and where it is made satisfactorily to appear that the party complaining has not and could not have sustained any injury from them." In Com. v. Filer, 249 Pa. 171, on page 178, Mr. Justice Elkin said: "It is strongly urged for appellant that the court below erred in overruling the motion for a new trial. Ordinarily, this is a question within the sound discretion of the trial judge, and the refusal of such a motion does not constitute reversible error unless there has been a clear abuse in the exercise of that discretion." Again he said: "The affidavit of the officer in charge of the jury in substance states that during the time he had taken the jurors out for exercise in the morning, they had stopped at a point near the railroad and viewed a location which the defendant had mentioned in his testimony, and that this was done in the absence of appellant and his counsel. The affidavits of the jurors being excluded, the facts stated in the affidavit of the officer were the only ones brought to the attention of the trial judge, not included in the record proper, in passing upon the motion for a new trial. There was nothing in this affidavit to indicate that the defendant was injured or prejudiced by anything the jurors did at that time, and the general rule is that a new trial will not be granted unless it appears that the alleged misconduct was prejudicial to the rights of the accused: 12 Cyc., 717. Such matters rest largely in the discretion of the trial judge: Alexander v. Com., 105 Pa. 1; Com. v. Manfredi, 162 Pa. 144." In the very helpful and carefully prepared book by Chief Justice Moschzisker, "Trial by Jury," on page 306, he said: "Sect. 421. I cite the Deutsch case as illustrative of the modern judicial tendency not to interfere with the course of trial in criminal cases, on complaints of misconduct, unless it satisfactorily appears the defendant himself was responsible for the matters complained of, or that they will materially harm him; a tendency which is now sufficiently established to call for notice. Sect. 422. If a defendant obtains knowledge during the course of his trial of any irregularities or misconduct of the jury which he believes will work to his prejudice, it is his duty immediately to lay the matter before the trial judge; for if, with this knowledge, he permits the case to go to verdict, he may be held to have waived the misconduct. A party 'is not allowed to take the chance of a favorable verdict and yet reserve the right to impeach it for known irregularities.'" Com. v. Deutsch, 72 Pa. Superior Ct. 298, referred to by the Chief Justice, is a very well considered and fully reported case. It has to be read in its entirety. In that case, the matter complained of was the refusal of the trial judge to withdraw a juror. The verdict was "guilty," but what Judge Head said on page 315 applies pertinently to this case. It is as follows: "The jury, by their verdict, stamped as truthful the evidence delivered by the Commonwealth's witnesses. In that evidence there is ample

warrant for the verdict they rendered. Why should the learned judge below, the court *in banc*, and this court be asked to surmise or conjecture that the verdict was the illegitimate child of the unsworn statement complained of, when a host of witnesses testified to facts from which the verdict would legitimately spring? Drastic action by the courts should be founded on facts or probable inferences therefrom. We think it is asking the court to take a long step when we are urged to set aside this verdict on the ground that the jurors may have been improperly influenced by reading the article complained of, if in fact they read it. That there is such a possibility no one, of course, can deny. But we are not convinced that any fair probability of it has been made to appear which would justify us in taking the action urged upon us. If we are to continue to have faith in our jury system, it must rest on the belief that when men of average intelligence and integrity have solemnly sworn to be guided in their deliberations by the evidence produced, and that alone, there will be enough of firmness and stability on their part to prevent them being swerved from the line of their duty by the vague unsworn statements of any one who does not share the responsibility which has been assumed by the jurors themselves. But it may be said that the preservation of the dignity of the courts would be imperiled if trials are to be attended with such incidents. We think not. The real dignity of the courts must have its roots in the ability and integrity of the judges who preside therein and the fearlessness and impartiality with which they exercise their powers. It is not an exotic plant which can bloom only in the artificial atmosphere of a hot-house. There is, therefore, in our opinion, nothing in that consideration to warrant our interference with the judgments in question." The discussion then continues upon another question—the conversation between a policeman and a juror, and the giving of money to a juror, and disclosure by the juror of the attempt, and the matter being brought to the attention of the trial judge, who thereupon examined the jurors in open court and refused to withdraw a juror. That action of the trial judge was approved on the authority of Com. *v.* Tilly, 33 Pa. Superior Ct. 35. When we turn to that case, we find that there was an attempt made to influence one of the jurors. Mr. Justice Henderson said: "It was due to the orderly administration of justice that inquiry be made on the subject before the case proceeded further. If such an attempt had succeeded, a miscarriage of justice might have resulted, and it would have been a useless proceeding on the part of the Commonwealth to have continued the trial of the case. No objection was made by the defendants to the examination of the juror, and it does not appear from his testimony that that which occurred had so prejudiced him as to disqualify him. He did not know in whose behalf the solicitation was made, and necessarily had no prejudice against any particular defendant. There is no reason for concluding that the verdict was influenced by the transaction disclosed by the juror. If the disclosure of such an attempt constituted sufficient ground for withdrawing a juror and continuing the cause, the administration of justice might be successfully obstructed, for similar efforts might be made from time to time as succeeding trials occurred." It will appear from both of those cases that the statement of the law laid down by the Chief Justice is supported by the latest authorities. One of the most helpful discussions of the subject that we have found is the case of Shomo *v.* Zeigler, 31 Legal Intell. 205, opinion by Judge Walker, which contains an exhaustive review of cases in the Supreme Court of this and other states. The syllabus of that case is as follows: "A verdict of a jury will not be set aside for the misconduct of a juror in conversing about the cause on trial with a witness before or during the trial, when no improper influence or

bias is shown, unless such misconduct was caused by a party to the suit, or his agent, or by his representations, and proof of the bias must be clear and manifest." The earlier decisions of the Supreme Court show that some of the propositions above stated were sustained at a very early date. In M'Corkle v. Binns, 5 Binney, 340, which was a motion for a new trial, it was alleged that one of the jurors, after he had been summoned, had stated that he would find a verdict against the defendant. Two witnesses swore that he made these statements. The juror denied it. Chief Justice Tilghman held that the defendant had not established the fact of the declaration, thus showing where the burden is. The syllabus is directly applicable to the present case, as follows: "If, after a jury are sworn and before the verdict, one of the parties learns that a juror, before he was empaneled, declared that he had made up his mind against him, he must make it known at once if he intends to rely on it. He must not take the chance of a verdict in his favor, and, upon its being the other way, move for a new trial upon the declarations of the juror." In the next case, Goodright et al. v. M'Causland et al., 1 Yeates, 372, the syllabus is: "Where the matter of fact has been left to the decision of the jury, the court will not grant a new trial; nor where a juror has betted on both sides of the cause, unless it produced an evident bias; nor where some of them have expressed their sentiments on the opening of the cause. The proof of jurors eating and drinking at the expense of the party for whom the verdict has gone must be clear and full, and must establish undue management or criminal intention of the party, before the verdict will be set aside." In Blaine's Lessee v. Chambers, 1 S. & R. 169, the syllabus is: "It is gross misbehavior for any person to speak to a juror, or for a juror to permit conversation concerning the cause, after he is summoned and before the verdict." That statement has been quoted perhaps more than any other statement by the judges of the lower courts in considering questions of this kind, but an examination of the case shows that it was a mere dictum. There was a motion for a new trial. The case was reversed for a misdirection of the trial judge. On page 172, Chief Justice Tilghman, after discussing that phase of the case, said: "I consider it unnecessary to give an opinion on another reason urged for a new trial; the misbehavior of one of the jury in holding conversations with the brother-in-law of the plaintiff, both before and after he was sworn. I am glad that the plaintiff himself was not in the least implicated, but it would be an injury to the administration of justice not to declare that it is gross misbehavior for any person to speak to a juryman, or for a juryman to permit any person to converse with him, respecting the cause he is trying, at any time after he is summoned and before the verdict is delivered. Upon the whole of this case, I am of opinion that there should be a new trial." That quotation shows that he was considering the conduct of the jury and of any one else who would speak to them as individuals. They were guilty of contempt of court. That matter is discussed fully by Judge Orlady in Greason v. Cumberland Ry. Co., 54 Pa. Superior Ct. 595. In Blaine's Lessee v. Chambers, Mr. Justice Yeates agreed with the Chief Justice that the case should be reversed for legal errors, and on the specific matter now before us, he said: "Upon the motion for the new trial before Judge Smith, the jurors implicated by the affidavits were not called upon to defend themselves against the charges, he being of opinion that the verdict was conformable to the justice of the case. If the truth of the fact was correctly stated in those affidavits, the person who attempted to labor the jury merited the most severe punishment, as such conduct poisons the first sources of justice. But, standing as the matter now appears before us, it is not, in my idea, a ground for awarding a new trial,

and particularly as the persons conducting the suit are not charged with misconduct." In other words, he draws a distinction between the misconduct of a party in talking to a juror and the misconduct of another party. Mix v. North American Co., 209 Pa. 636, is a case that stands alone on its facts. The irregularities in that case the Supreme Court deemed so great that a new trial should be granted. At the conclusion of the opinion, the court said: "We are not prepared to say that, in itself, any one of the several reasons assigned by the appellants for a new trial, and to which we have called attention, ought to have moved the court below to grant it; but all of them taken together manifestly should have done so." Com. v. Hoover, 227 Pa. 116, was entirely unlike the present case, for in that case the trial judge permitted constant and continuous outbursts against the defendant, which the Supreme Court held polluted the whole atmosphere and prevented the defendant from having a fair trial. After carefully studying the decisions of the Supreme and Superior Courts, we feel that it is not enough to show that there were some irregularities in the trial, but that it must be made to appear to the court that the defendant was prejudiced by what occurred. The mere showing of irregularities is not enough. Whether the burden is on the Commonwealth or on the defendant matters little. The court must examine the evidence, and if the court is satisfied from the evidence that the defendant is guilty beyond any reasonable doubt, before the verdict is set aside the court must be satisfied that the defendant did not have a fair trial. In the present case, we have again re-examined the testimony. The Commonwealth proved overwhelmingly by the testimony of the directors of the trust company and by the testimony of the officers of the State Banking Department that the defendant was guilty. The Commonwealth also proved the admissions and confessions of the defendant, and although he denied these matters, yet it could scarcely be supposed that a jury would believe his story in preference to the witnesses for the Commonwealth. It is a sad case that a man who occupied the prominent position in this county that the defendant did, who was a justice of the peace for twenty-four years, who was county commissioner for eight years, who was president of a trust company for fifteen years, and who had the respect and confidence of the people who knew him, would have entered into the criminal conspiracy that he entered into, especially when one of the purposes was to pay the trust company for a bad debt which it had contracted knowingly. There is some extenuation for the defendant in that the present case was not the case of stealing and putting money in his own pocket. Nevertheless, the result of that conspiracy was the loss of many thousands of dollars to the innocent stockholders of this trust company. An epitome of the whole case is the statement, testified to by a number of the witnesses, that the defendant said, at Harrisburg: "It is true; I made a mistake; you can take all I have, or put me in jail."

Let us examine in detail the reasons and the depositions. Reasons (a) and (b) are as follows: "(a) That Meda C. Vogel, housekeeper, from Lehigh Township, Northampton County, a juror drawn on the panel of jurors in attendance at court and serving during the third Monday of September, at the time of the trial in the above-entitled case, and before the jurors were called upon their voir dire examination for the purpose of challenge, openly and actively declared and stated to the members of the panel of jurors in attendance at the court, for the purpose of influencing the verdict, and also for the purpose of impressing the jurors with a false statement of public sentiment, that, if she were drawn on the jury, she would find the defendant guilty, no matter what the evidence in the case showed.

"*(b)* That the said Meda C. Vogel was called upon her *voir dire* examination in order for the defence to determine upon its challenges for cause. The said Meda C. Vogel, a juror on the panel, declared and stated that she had not read about the case and had formed no opinion and thereby compelled the defence to use and exhaust one of its peremptory challenges, when a consistent statement from the said juror would have enabled the defence to challenge for cause." Meda C. Vogel was not a juror in this case. She was on the general list of jurors and was challenged peremptorily by the Commonwealth after she was examined about her acquaintance with Congressman Kent. It is a mistake, as stated in *(b)*, that she was challenged peremptorily by the defendant. The record kept by the clerk and her testimony showed the fact to be otherwise. It is alleged that openly, and for the purpose of influencing the verdict, she declared to members of the jury that if she were drawn on the jury, she would find the defendant guilty. There is no proof at all in the depositions that she was guilty of these things. Luther Ott, who was on the panel of jurors, but was not on the jury, and was not called as a juryman in this case, testified that he heard a lady that favored Meda Vogel say that, if she got on the jury, she would settle the case soon, and he inferred from what she said that she thought that the defendant was guilty, but the lady was not talking to him but to another juryman, a Mr. Groner. Mr. Groner's deposition was not taken, but he was not on the jury that tried the defendant. He was called as a juror, and was challenged peremptorily by the Commonwealth. Meda Vogel was examined about this matter, and she denied that she had any conversation with any of the men jurors, or with any one outside of the court-house. She admitted, however, that she had a conversation with a lady who was on the general panel. That conversation took place in the ladies' rest-room. The testimony is as follows: "Q. What was said? A. Just as we walked in the ladies' room, Mrs. Jordan turned around and faced me. I don't know none of these two jurors that were on this case, but some of the others; for instance, I know there was one lady there; I don't know her name. She turned around and she said: 'Girls, let me tell you. If any one of you girls get on Mr. Buzzard's case, please be easy and lenient with him; he didn't do it intentionally; he has no bad name.' That is what Mrs. Jordan said to us girls. Q. Was anything else said? A. Of course. I said, 'No;' I said, 'He didn't do it intentionally, but wilfully; the dirty skunk ought to be in jail.' That is what I said. Q. Was anything else said? A. No; that is all that was said." She testified that that conversation was while the Buzzard jury was being selected, and that there were other jury ladies in the room. She testified that she supposed that all the jury ladies were there, but she could not mention who they were. She testified that the only two women, Mrs. Siegfried and Mrs. Koch, that were on the jury had been passed by the parties at the time when this conversation took place. She fixes the time when the Buzzard case was called as about 11.30 in the morning. My notes show that the selection of the jury commenced on Thursday, Sept. 23, 1926, at 11.05. My notes also show that the jury was sworn the same day at 1.47. There was an hour and a half out of that for lunch. I am positive that the two ladies in question were selected before we adjourned for lunch, Mrs. Siegfried being the first one chosen and Mrs. Koch being the third one chosen. To the best of my recollection, at least half of the jury were selected before lunch. Placing the matter in the best light to support defendant's contention, is there anything in this conversation that would affect the action of the jury women, Mrs. Siegfried and Mrs. Koch? Each of these women was examined as a witness upon another reason, but neither the learned district attorney nor the learned

counsel for the defendant examined them about this matter. We cannot infer that they were present when Mrs. Jordan and Mrs. Vogel had the above-mentioned conversation, and if they had been, what was said cannot be presumed to have influenced them. Mrs. Jordan said she believed he was innocent and Mrs. Vogel said she believed he was guilty. So far as Mrs. Vogel is concerned, there is no evidence of any intent to influence any one except Mrs. Jordan in her reply. Mrs. Vogel's reply was instantaneous and not designed. If any one was guilty of an "attempt" to influence the jury, it was Mrs. Jordan, who told the "girls" that if they got on the jury, they should find him innocent. The case is somewhat like the case of Goodright et al. v. M'Causland et al., 1 Yeates, 372, where the testimony showed that a juror bet a pint of wine one way and a gallon and a pint the other way. Yet the Supreme Court said that he was not biased. This incident is one in which neither of the lady jurors in the case took any part whatever, and it would be an unfair imputation to suppose that, even if it was proved that they were present and had heard the conversation, they were influenced by it. With respect to reason (b), we have already pointed out that the defendant did not challenge Mrs. Vogel. She was challenged by the Commonwealth, and, of course, the defendant could not have prevented that, and was not in any way injured by the Commonwealth's action. If the defendant had challenged her peremptorily, and after trial had found out that if she had told the truth on her voir dire, he could have, at the trial, challenged her for cause, he could not have asked for a new trial on that ground because the record shows that he had not exhausted his peremptory challenges, and, therefore, he was not hurt, whether his challenge was for cause or peremptory. It was the defendant's duty to examine each juror fully when called to discover cause of challenge, and if there was neglect to do that, it is held to be a waiver: Com. v. Walker, 283 Pa. 468. In the present case, Mrs. Vogel testified that she was not examined at all about any prior expression of opinion as to defendant's guilt.

Reason (c) is as follows: "That James A. Taylor, the representative of the Banking Department of Pennsylvania and the active and directing prosecutor in the case, during the trial and while the defendant was on the stand, in a loud and audible tone of voice, so that it reached the members of the jury sitting in the jury-box, repeatedly declared while the defendant was testifying, 'It's a lie;' and that the said statement of the active prosecutor did influence and impress the jury, which said statement was not competent and was not made while the declarant was under oath, and said statement or statements were made with the intent of influencing and impressing the jurors." The two lady jurors, Mrs. Siegfried and Mrs. Koch, testified that while the defendant was testifying they heard Mr. Taylor, the First Deputy Secretary of Banking, who was sitting at the Commonwealth's table with Mr. Soule, another official from the State Banking Department, aiding the district attorney in the trial of the case, say, not audibly, but with his mouth: "You lie." He said that twice, and then he said, "It is a damn lie." Five jurors who sat in the jury-box, four of them in the front row, were called, and testified that they did not hear him make these expressions, and did not see his lips go through any form. The district attorney (see close of the testimony) informed counsel for the defendant that all the jurymen in the case were present except one, and that they could examine them if they desired, but the mere fact that ten did not hear the remark would only be negative testimony. These ladies say they did not hear what was said, but saw his lips move. Russell J. Buzzard, the son of the defendant, was examined on this subject. He was sitting at the defendant's table, and between him and Mr. Taylor, Mr. Smith was

sitting. He said he heard the remarks and that they were made loud enough to be heard by the jury. Mr. Soule probably explains the whole matter. The words were said, not as Russell Buzzard said, in a loud tone of voice, but as he said they were spoken by Mr. Taylor in a whisper to Mr. Soule. The lady jurors saw the motion of his lips, but they heard nothing, and the other jurors heard nothing, and, of course, Messrs. Smith and Paff heard nothing, or they would have brought the matter at once to the attention of the court. The witness Taylor took the stand and testified, and from his point of view, what Mr. Buzzard had said was untrue. We cannot presume from the fact that he denied the truth of Buzzard's testimony under oath that he was "prejudiced" against him, and if he were trying to influence and impress the jurors in saying what he did to Mr. Soule, he could scarcely have done it without the vigilant counsel for the defendant detecting it and at once bringing it to the court's attention. No one has a right to interject any comment from any part of the court-room as to the testimony of a witness on the stand, and whenever an improper remark is brought to the attention of the court, we immediately reprimand the offending party. The depositions do not satisfy us that Mr. Taylor's improper conduct could have influenced the jurors.

Reasons (d) and (e) can be considered together. Reason (d) is as follows: "That Floyd M. Hess, a witness for the Commonwealth, entered into a long and protracted conversation with one of the jurors at noontime of the next to the last day of trial, in front of the Mt. Vernon Hotel, on Northampton Street, in the City of Easton, and thereby influenced the juror. (The name of which juror is unknown, but his identity can be established.)" The juror who engaged in conversation with Mr. Hess was Mr. Illick. For obvious reasons, Hess was not called as a witness. Mr. Illick was. He testified that he met Mr. Hess below the court-house steps and walked with him to the Mt. Vernon Hotel. He was examined about what they talked about, and said it was the weather and about their relationship. He was then asked whether they talked about anything else, and he said "nothing at all."

Reason (e) is as follows: "That James A. Taylor, a witness for the Commonwealth and the active prosecutor in the above-entitled case, together with the witness Graff and Mr. Soule, another witness for the Commonwealth, complainant in the case, entered into an active and prolonged discussion of the case in the presence and hearing of a group of jurors in the corridor of the court-house on the morning of the day when witness Graff testified." It appeared from the depositions that Mr. Graff, who was the ex-first deputy of banking, and who was an important witness for the Commonwealth, being present at both the Sunday night meeting in Bangor and at the meeting in Harrisburg, was 'phoned for to come to Easton. He was not present during the first week of the trial. He reached Easton on Sept. 30th, shortly before noon. Immediately after lunch, in company with Mr. Taylor and Mr. Soule, he held a conference with Mr. James about the case in the corridor of the court-house. No juror was within such distance that he could have heard what was taking place unless the party spoke in a very loud tone of voice. Only one of the jurors was asked about the corridor incident, and he testified that he did not hear anything said, and the opportunity was afforded to examine others upon this subject if counsel cared to examine them. We have read all of the depositions on the subject and are satisfied that the meeting was a necessary one and an entirely innocent one. There is, however, another feature about these two reasons, (d) and (e), that, under the authorities quoted above, makes it impossible for us to consider them, and that is the fact that each incident was known to counsel for the defendant, and if anything

prejudicial to their client's case occurred, it should have been at once brought to the attention of the court during the trial, and then an investigation could have been had, as was done in the case of Com. v. Deutsch, 72 Pa. Superior Ct. 298. Whether all the reasons are considered separately or together, we feel that they are not sufficient to warrant us in granting a new trial. This case was very thoroughly and carefully tried by the learned counsel for the defendant, and the defendant himself had an opportunity of placing his entire defence before a jury that was carefully selected, and the only reason that would move us to grant a new trial would be sympathy for the defendant, which, of course, can have no place in the consideration of the present applications.

And now, Jan. 10, 1927, rule to show cause why a new trial should not be granted is discharged and motion in arrest of judgment is denied.

From Henry D. Maxwell, Easton, Pa.